IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DEB RITCHIE, | ) | CIV. NO. 13-00525 JMS-BMK |
| | ) | |
| Plaintiff, | ) | ORDER (1) GRANTING IN PART |
| | ) | AND DENYING IN PART |
| vs. | ) | DEFENDANT NATIONAL |
| | ) | FOOTBALL LEAGUE'S MOTION TO |
| NATIONAL FOOTBALL LEAGUE, | ) | DISMISS OR IN THE ALTERNATIVE |
| STATE OF HAWAII, DOE | ) | MOTION FOR SUMMARY |
| ENTITIES 1-10, DOE | ) | JUDGMENT, DOC. NO. 125; |
| INDIVIDUALS 1-20, | ) | (2) DENYING DEFENDANT STATE |
| | ) | OF HAWAII'S  JOINDER IN THE |
| Defendants. | ) | NATIONAL FOOTBALL LEAGUE'S |
| | ) | MOTION, DOC. NO. 127; |
| | ) | (3) DENYING THE STATE'S MOTION |
| | ) | FOR PARTIAL SUMMARY |
| | ) | JUDGMENT, DOC. NO. 121; AND |
| | ) | (4) DENYING PLAINTIFF'S MOTION |
| | ) | FOR PARTIAL SUMMARY |
| _____ | ) | JUDGMENT, DOC. NO. 118 |

**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT NATIONAL FOOTBALL LEAGUE'S MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT, DOC. NO. 125; (2) DENYING DEFENDANT STATE OF HAWAII'S  JOINDER IN THE NATIONAL FOOTBALL LEAGUE'S MOTION, DOC. NO. 127; (3) DENYING THE STATE'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DOC. NO. 121; AND (4) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DOC. NO. 118**

## I.  INTRODUCTION

On September 18, 2013, Plaintiff Deb Ritchie ("Plaintiff"), who has a

mobility impairment, filed this action in the First Circuit Court of the State of

Hawaii against Defendants the National Football League (the "NFL") and the State of Hawaii (the "State") (collectively, "Defendants"). Plaintiff asserts claims for violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and state law claims based on Defendants' refusal to allow Plaintiff to access the front-row seat she purchased for the 2013 Pro Bowl at Aloha Stadium. The State subsequently removed the action to this court.

Currently before the court are dispositive motions filed by each of the parties. The NFL, joined by the State, argues that Plaintiff lacks standing on her disability discrimination claims, and has also failed to establish a genuine issue of material fact in support of any of her claims. The State seeks partial summary judgment on Plaintiff's Rehabilitation Act claim on the basis that Aloha Stadium does not receive any federal funds, and Plaintiff seeks a summary judgment ruling that the NFL was responsible for all decisions relating to the operation of Aloha Stadium at the 2013 Pro Bowl. Based on the following, the court GRANTS in part and DENIES in part the NFL's Motion, DENIES the State's Joinder, and DENIES the State's and Plaintiff's Motions.

///

///

///

## II.  BACKGROUND

**A.     Factual Background**

        The NFL's Pro Bowl is an annual football game organized by the
NFL where all-star teams made of players from the League's two conferences, the
National Football Conference and the American Football Conference, compete
against each other.  Doc. No. 142-9, NFL Ex. H, Tedescung Bandy Decl. ¶ 4.  The
Pro Bowl has been held at Aloha Stadium in Honolulu, Hawaii for a number of
years, and is slated to be played again at Aloha Stadium in 2016.  *See id.* ¶ 14.
The State owns Aloha Stadium and operates it through the "Stadium Authority."
Doc. No. 126, NFL Concise Statement of Facts ("CSF") ¶ 6;[1] *see also* Hawaii
Revised Statues ("HRS") § 109-2 (granting the Stadium Authority power to
maintain, operate, and manage Aloha Stadium).  Pursuant to HRS § 109-1, the
Stadium Authority is "within the department of accounting and general services
[(the "DAGS")] for administrative purposes only."

        Plaintiff attended the Pro Bowl at Aloha Stadium from 2011 through
2014, and brings this action against the NFL and the State based upon their
alleged refusal during the 2013 Pro Bowl to allow Plaintiff access to her ticketed

_____

        [1]  Where the parties do not dispute a particular fact propounded by a party, the court cites
directly the party's CSF.

seat in the front row due to her mobility impairment.  *See* Doc. No. 126, NFL CSF

¶ 1.  The court first outlines the Stadium Authority's and the NFL's

responsibilities pursuant to contract and/or state law regarding seating and security

at the 2013 Pro Bowl, and then describes Plaintiff's attendance at the Pro Bowls at

Aloha Stadium.

      **1.**      ***The Stadium Authority's and the NFL's Duties for Pro Bowl 2013***

        On January 19, 2013, the Stadium Authority, the Hawaii Tourism

Authority ("HTA"), and the NFL entered into a license agreement for the 2013 Pro

Bowl to be played at Aloha Stadium on January 27, 2013 (the "License

Agreement").  *See* Doc. No. 120-1, Pl.'s Ex. 1.  Under the License Agreement, the

Stadium Authority granted the HTA a license for the entire and total use of Aloha

Stadium, and the HTA granted a license to the NFL to conduct the 2013 Pro Bowl.

*Id.* ¶ 1.  The License Agreement describes that although the Stadium Authority

retains the right to manage Aloha Stadium during the Pro Bowl, the NFL has the

right to make decisions regarding operation of Aloha Stadium, including security.[2]

---

[2] In particular, the License Agreement provides:

> The Stadium Authority retains the right to control and manage
> Aloha Stadium at times when the NFL is using Aloha Stadium
> pursuant to this Agreement, but any exercise of such control by
> Stadium Authority shall be consistent with the other provisions of
> this Agreement.  Notwithstanding the foregoing, the NFL shall
> have the right to make all decisions relating to the operation of

(continued...)

*See also* Doc. No. 120-3, Pl.'s Ex. 9, Andrew Chang Dep. at 56 (stating that the

NFL is the user of the stadium and "in charge of operations").

As to security, the License Agreement provides that the Stadium

Authority has a multi-year contract with G4S Secure Solutions USA Inc. ("G4S")

to provide private security services at Aloha Stadium, and that (1) the NFL will be

responsible for all costs from G4S's services at the Pro Bowl, (2) the Stadium

Authority shall provide a draft security plan to the NFL, and (3) the NFL may

communicate directly with G4S regarding implementation of the plan.  Doc. No.

120-1, Pl.'s Ex. 1, ¶ 5(c)(4).  To that end, the NFL and G4S entered into a Crowd

Management and Security Services Agreement regarding the Pro Bowl (the "G4S

Agreement").  *See* Doc. No. 150, Pl.'s Ex. 2 at NFL000776-795.  The G4S

Agreement provides, among other things, that G4S will (1) "design and

implement, in coordination with the NFL, crowd management and security plans

for [the Pro Bowl]," (2) "remain in communication with designated NFL staff

---

[2](...continued)
>
> Aloha Stadium on the Pro Bowl Game Day (as defined below),
> including, but not limited to, the assignment of meeting rooms,
> available storage space, tent space, security, in-house labor,
> contracted labor, and vendor personnel.  The rights of the Stadium
> Authority under this paragraph shall be exercised in cooperation
> with the NFL and HTA to allow the 2013 Pro Bowl Game and
> related events to be presented in a safe, cost-effective, and
> successful manner.

*See* Doc. No. 120-1, Pl.'s Ex. 1 ¶ 2(b).

throughout [the Pro Bowl]," and (3) "promptly report to the NFL orally and follow up in writing as soon as possible . . . regarding any significant crowd management or security service incident or breach of security." *Id.* at NFL000778-79. According the NFL Director of Security Services, Lenny Bandy, the G4S Agreement was for G4S to provide on-field security and gate security, and the NFL was not managing G4S personnel located in the stands. Doc. No. 142-2, NFL Ex. A, Bandy Dep. at 41-42.

As to general staffing, the License Agreement provides that the Stadium Authority shall submit a staffing plan to the NFL for approval, and the NFL may increase staffing at its expense. *See* Doc. No. 120-1, Pl.'s Ex. 1, ¶ 5(c)(3). The License Agreement also incorporates the Rules of the Stadium Authority, codified as Hawaii Administrative Rules ("HAR") Chapter 3-70, which provides that the manager of the Stadium Authority shall determine and furnish the staff necessary to operate the facility for an event, which may include, for example, box office personnel, ushers, gate personnel, and security personnel, all at the licensee's expense. *Id.* ¶ 24; *see also* HAR § 3-70-10.

Although neither agreement describes responsibilities in case of an incident at the Pro Bowl, an "Assignment List" provides:

> Aloha Stadium ushers are the first line of stadium
> authority followed by private security personnel. In the
> event stadium and private security personnel need
> assistance, they will call for [Honolulu Police
> Department ("HPD")] Special Duty officers to stand by
> and take action if necessary. Rapid Deployment Force
> officers will be available to assist if necessary.

Doc. No. 134, Pl.'s Ex. 14. In addition to paying for G4S security personnel, the

NFL paid HPD officers to provide additional security at the Pro Bowl. Doc. No.

Doc. No. 120-3, Pl.'s Ex. 11, Bandy Dep. at 52.

### 2. *Events Leading up to the 2013 Pro Bowl Regarding Plaintiff's Request for Accommodation*

Plaintiff attended the 2011 and 2012 Pro Bowls at Aloha Stadium

with her family and enjoyed the games "tremendously." Doc. No. 126, NFL CSF

¶ 5. Plaintiff therefore purchased ten tickets to the 2013 Pro Bowl in the first and

second rows of Aloha Stadium, and she intended to sit in the front row. Doc. No.

122, State CSF ¶¶ 1-2. Prior to the 2013 Pro Bowl, however, Plaintiff suffered an

accident requiring her to use a wheelchair and crutches to ambulate.[3] Doc. No.

126, NFL CSF ¶ 7. As a result of this accident, Plaintiff asserts that she is able to

---

[3] Prior to this accident, Plaintiff had suffered a number of other injuries, which resulted in muscoskeletal injuries and damage to her ear. Prior to the accident, Plaintiff periodically used a wheelchair and/or walker. *See* Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 41-42. Plaintiff did not use a wheelchair or walker at the 2011 or 2012 Pro Bowls. *Id.* at 70-72, 77.

walk only a short distance without crutches and with the assistance of shoes

containing wheels on the feet.  Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 44-45.

Given Plaintiff's dependence on a wheelchair and crutches, on

January 23, 2013, Plaintiff emailed Terry Wooten, an NFL employee, to inquire as

to how she could best reach her front row seat.  Plaintiff wrote:

> I do not want to give up my front row seat to the game,
> but I am now in a motorized wheelchair (Quantum rehab
> 6000Z)[.]  I have wheels on my feet (shoes) and special
> smartcrutches to drag myself down the aisle to my seat
> from my wheelchair, but the front row is down a full
> flight of steep stairs at the Aloha stadium which I cannot
> do under any circumstances[.]

Doc. No. 126-6, NFL Ex. D, Bandy Dep. Ex. B.  Plaintiff further explained that

because "the wheelchair seating is way up and in the endzones," she was

requesting a field pass to access her front-row seat.  *Id.*

Wooten forwarded this request to Stadium Authority Box Office

Manager, Ainsley Paki, who wrote back that after consultation with the Stadium

Authority's Events Manager Stephen Lee and Aloha Stadium's Security Chief

Andrew Chang, they were willing to accommodate Plaintiff by having her sit in

the accessible seating area near Section M with a companion.  Doc. No. 134, Pl.'s

Ex. 4 at NFL000292.  Paki further rejected the request for field access, which was

limited to those with NFL credentials, and explained that even if Plaintiff could

get to the front row seat, Stadium Authority did "not have the flexibility or staff to help her with restroom facilities or to purchase items at the snack bar." *Id.*

The NFL's Wooten forwarded Paki's response to Plaintiff, who wrote back that she did not want to sit in the accessible seating, she would come early to get to her seat, and she would not get up during the game. Doc. No. 134, Pl.'s Ex. 4 at NFL000291-92. Wooten responded, "I get your dilemma but please understand we are trying to accommodate your needs the best we can, but only have so many options. I have copied the parties involved for one more look at your circumstance." *Id.* at NFL000290. The individuals Wooten copied included the Stadium Authority's Paki, Lee, and Chang.

Chang forwarded the email thread between Wooten and Plaintiff to NFL Director of Security Services Lenny Bandy and another NFL security employee, Rob Agnew, to get their "thoughts on this matter." *Id.* In the meantime, Paki informed Wooten that Plaintiff's request was forwarded to NFL Security, who would make a determination. *Id.*

On January 25, 2013, NFL's Bandy informed Chang, Agnew, Lee, and Wooten that he had two tickets for Plaintiff in the ADA accessible seating area in Section M, Doc. No. 134, Pl.'s Ex. 3 at NFL000548, which were in the same section and for the same price as the seats Plaintiff had purchased. Doc. No.

126-11, Bandy Decl. ¶ 13. Bandy gave Lee permission to call Plaintiff to "try to talk it out to see what she needed," Doc. No. 120-4, Pl.'s Ex. 15, Lee Dep. at 7-8, and Lee reported back to Bandy that Plaintiff stated that she (1) would not give up her seat in the first row, (2) would find a way to get to her seat, by "scoot[ing] down on her butt" if necessary, and (3) was still interested in the offer of Ohana Day field access.[4]  *Id.* at NFL000547-48; Doc. No. 120-4, Pl.'s Ex. 16, Lee Dep. at 49-50.

Upon hearing Plaintiff's reaction to the offered ADA seating, NFL's Bandy told Lee via email:

> I am troubled by Ms. Ritchie's statement that she is going to find "a way to get to the first row."  The decision is the stadium's to make, but I remain concerned that her presence in a non-ADA accessible viewing area will create a hazardous condition for her and others seated around her.

*Id.* at NFL000547.  Bandy further explained that the NFL had offered her field access during Ohana Day as a "gesture of good will if she complied with the stadium's wishes to relocate to the ADA accessible viewing area," and that the

---

[4]  Ohana Day is held the day before the Pro Bowl, where both NFL all-star teams practice at Aloha Stadium and various activities, events, and performances take place on the field to entertain spectators.  Doc. No. 142-9, NFL Ex. H, Bandy Decl. ¶ 5.  The record does not make clear when Ohana Day field access was offered to Plaintiff.

NFL had no reason to extend her this courtesy if she was unwilling to take the accessible seats.  *Id.*

According to Plaintiff, she discussed with the Stadium Authority's Lee and Chang various methods for her to get to her front-row seat, and that while they strongly urged her to use the accessible seat offered to her, they stated that they would not block her from going to her seat as long as she did not use the Aloha Stadium staff to do so.  Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 249-51. She further asserts that the accessible seating offered to her was "significantly inferior" because the view of the field is frequently blocked by other spectators and there is no partition separating the wheelchairs from the passing crowd, resulting in spectators jarring or bumping the wheelchairs.  Doc. No. 157, Pl.'s Decl. ¶ 7.

### 3.    *The 2013 Pro Bowl Game Day*

On the day of the 2013 Pro Bowl, Plaintiff arrived between an hour or hour and a half before kickoff.  Doc. No. 126-8, NFL Ex. F, Gary Rivers Dep. at 6. Upon arrival, the battery for Plaintiff's motorized wheelchair failed, and she asked a Stadium Authority employee, Gary Rivers, for assistance in getting to her seat. *Id.* at 5-6, 10.  Rivers provided Plaintiff a manual wheelchair and escorted her towards the seating area.  *Id.* at 10-11.  When Rivers learned that Plaintiff's seat

was in the front row, he became concerned about how she would navigate the

stairs going down to her seat (approximately sixty in total). *Id.* After conferring

with other Stadium Authority employees via walkie-talkie, Rivers told Plaintiff

she could sit in the front row if she were able to safely walk down the stairs on her

own. *Id.* at 10-11. Rivers further rejected Plaintiff's plan of going down the stairs

on her rear end, Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 258, and Plaintiff agreed

that she would attempt to descend the stairs with her crutches and wheeled shoes.

*Id.* at 261.

Rivers and two G4S officers accompanied Plaintiff to the stairs

leading to her front-row seat. *See* Doc. No. 126-8, NFL Ex. F, Rivers Dep. at 12.

At the stairs, Plaintiff descended five to eight stairs using a method Plaintiff

described as follows:

> I had the crutches and I hold the rail. I plant -- I don't
> know if you ski. I plant the pole. There's -- where the
> chair bolts onto the cement and where the railings bolt,
> you can brace your crutch against, so you have a firm
> hold. So you're against something. You're not just on
> slippery pavement.
>      And then I just wheel slowly to the edge of the
> step. . . .
>      So to wheel, you just lean back slowly. And I only
> do one foot. The other foot is complete brake. You do
> one foot slowly, wheels to the edge. And then you just --
> tips down. And then you're still holding the rail and you
> still have the crutch fully supporting you. And Michael's

> right beside me. And then slams down. And then you
> just do the same with the other. . . .
> . . .
> And you do one foot at a time. So one foot is always
> parked at full stop. And you're holding the rail and
> you're holding the crutches are planted and Michael's
> beside me.

Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 264-67. In comparison, Lee asserts that (1) Plaintiff "was rolling off the edge of each step on her wheelie shoes with both of her feet launching off the step at the same time," (2) every time Plaintiff hit the step below she was noticeably off balance and unstable, and (3) this method took an "exceptionally long time" for Plaintiff to descend each stair. Doc. No. 126-1, Lee Decl. ¶ 9. In any event, Rivers observed Plaintiff having a difficult time descending the stairs and therefore directed a female G4S officer to stand below Plaintiff in case she fell. *See* Doc. No. 126-8, NFL Ex. F, Rivers Dep. at 27. Plaintiff testified that as she implemented this method, the female G4S officer in front of her directed her to go slower, and that the officer's presence in her space "kind of altered the way [Plaintiff] would normally [go down the stairs]." Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 268, 274.

Lee, in consultation with Chang and other Stadium Authority staff, made the decision that Plaintiff would not be permitted to continue down the stairs. Doc. No. 126-1, Lee Decl. ¶ 9. Lee made this decision based on safety

13

concerns -- Plaintiff's descent raised the possibility of injury to herself or others, she was blocking other patrons' access to their seats, and Aloha Stadium was under a lightning strike warning, which would have required patrons to evacuate from the uncovered seating areas, including the front-row seat Plaintiff purchased. *Id.* ¶ 10; Doc. No. 126-11, Bandy Decl. ¶ 11.

According to Rivers, when Plaintiff was told that she must use the accessible seat provided to her, Plaintiff became loud and disrespectful, and refused to go to that seat. Doc. No. 126-8, NFL Ex. F, Rivers Dep. at 53-54. As a result, Plaintiff was told that she would need to use the accessible seat provided by the NFL, or that HPD officers would remove her from the stadium.[5] Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 274, 294; Doc. No. 126-8, NFL Ex. F, Rivers Dep. at 53-54. Ultimately, an HPD officer assisted Plaintiff up the stairs by lifting her legs up each stair. Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 290. After Plaintiff was seated in a wheelchair in the accessible seat provided by the NFL, HPD officers left. *Id.* at 292.

---

[5] Plaintiff recounts these events differently -- Plaintiff asserts that she was told she must get back up the stairs in ten minutes or that she would be arrested. Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 278-79, 280, 288. This difference in stories does not affect the court's summary judgment analysis.

Plaintiff was provided both the accessible seat and an additional companion seat. Doc. No. 126-11, Bandy Decl. ¶ 13. From this new seat, Plaintiff complained that "you couldn't see a single thing except everybody coming up and down [the stairs]." Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 295-96. Although Plaintiff's accessible seating was moved when she complained, she asserts that her view did not improve, even though she was no longer blocked by the individuals coming up and down the stairs. *Id.* at 296-97.

After the 2013 Pro Bowl game and while still at Aloha Stadium, Bandy spoke with Plaintiff, and, according to Plaintiff, acknowledged that he was aware of what had occurred regarding her seating arrangement, *see* Doc. No. 126-6, NFL Ex. D at 15-16, and that he was responsible for denying her permission to sit in her front-row seat. Doc. No. 157, Pl.'s Decl. ¶ 23.

### 4. *2014 Pro Bowl and Future Plans to Attend the Pro Bowl*

In 2014, Plaintiff again purchased front-row seats to the 2014 Pro Bowl. Prior to the game, counsel for the NFL and the State reminded Plaintiff's counsel that Plaintiff's seats were not accessible and that for the safety of Plaintiff and others, she "needs to be able to exit her seat without assistance and in a way that does not impede other patrons." Doc. No. 156, Pl.'s Ex. N. Defendants therefore reserved accessible seating for Plaintiff and three companions in the

event Plaintiff "is unable to safely enter and exit her purchased seat without assistance on game day." *Id.* In response, Plaintiff's counsel notified Defendants that Plaintiff intended to sit in her purchased seat in the front row and that she sought no assistance or accommodation from Defendants. Doc. No. 156, Pl.'s Ex. O.

Plaintiff attended the 2014 Pro Bowl at Aloha Stadium and had no complaints regarding access to her seat on the front row. Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 94-95, 116. Plaintiff testified that she was able to descend the stairs without assistance from staff the "[s]ame way I would have for 2013. 'Cause nobody was helping me go down at that time. They were just in my way and then beside me as a safety precaution." Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 300. Plaintiff did, however, bring with her an individual to provide assistance, and this same individual attended the 2013 Pro Bowl for this same purpose of providing assistance to Plaintiff. *See* Doc. No. 157, Pl.'s Decl. ¶ 35. According to Plaintiff, at the 2014 Pro Bowl this individual provided assistance to her in descending the stairs, *id.*, Doc. No. 172, Louis Erteschik Decl. ¶ 9, and video shows Plaintiff enter the Stadium's seating area using crutches (as opposed to a wheelchair), and then descend down the Stadium stairs using her

smartcrutches and with the assistance of an individual standing in front of her as she made her way down the stairs. *See* Doc. No. 196, State Ex. 2.[6]

Plaintiff currently uses a wheelchair, crutches, and her shoes with wheels, and estimates that she can walk without her wheelchair or crutches and using only her shoes with wheels for ten to twenty feet. *See* Doc. No. 170, Pl.'s Decl. Ex. A at 43. Although Plaintiff attended the 2011 through 2014 Pro Bowls while her children were attending the University of Hawaii during these years, *see* Doc. No. 126-3, NFL Ex. A, Pl.'s Dep. at 28-29, Plaintiff asserts that she plans to spend winters in Hawaii for the foreseeable future because cold weather causes her discomfort. *See* Doc. No. 157, Pl.'s Decl. ¶¶ 10-12. Plaintiff further asserts that she is a football fan and has "a very definite intention to attend all Pro Bowls held in Hawaii and intend[s] to continue my custom of sitting in the front row to enjoy its unique 'up close and personal' exposure to NFL players." *Id.*

_____

[6] Defendants both argue that the video of the 2014 Pro Bowl and her deposition testimony contradict Plaintiff's assertions in her Declaration that she received assistance in descending the stairs at the 2014 Pro Bowl. *See* Doc. No. 195, NFL Reply at 12; Doc. No. 196, State Reply at 3. The court rejects this argument. Although grainy, the video shows an individual standing in front of and facing Plaintiff as she descends the stairs, and possibly touching Plaintiff's arms at certain times. Whether this individual physically touched Plaintiff, the court has little difficulty finding that this individual assisted Plaintiff down the stairs at the 2014 Pro Bowl -- this individual provided a safety net for Plaintiff in case she became unsteady. Further, based on the record presented, the court cannot discern whether Plaintiff used a different method to descend the stairs in 2014 than 2013, especially in light of Plaintiff's testimony that her "ability to understand how to move may have been more pleasing to the eye" at the 2014 Pro Bowl. *See* Doc. No. 196-2, State Ex. 1 at 300.

¶¶ 8-9.  Although the 2015 Pro Bowl is to take place in Arizona, the 2016 Pro

Bowl is scheduled to return to Aloha Stadium.  Doc. No. 126-11, Bandy Decl.

¶ 14.

## B.    Procedural Background

On September 18, 2013, Plaintiff filed this action in the First Circuit

Court of the State of Hawaii, and on October 10, 2013, the State removed the

action to this court.  Plaintiff's First Amended Complaint, filed October 31, 2013,

alleges claims against (1) all Defendants for violations of HRS § 489-3 (Count I),

HRS § 489-5 (Count II), and Title V of the ADA, 42 U.S.C. § 12203(b) (Count

V); (2) the NFL for false imprisonment (Count III), and violation of Title III for

the ADA, 42 U.S.C. § 12181 *et seq.* (Counts VII-XIII); and (3) claims against the

State for violations of Title II of the ADA, 42 U.S.C. § 12131 *et seq.* (Count IV),

and the Rehabilitation Act, 29 U.S.C. § 701 (Count VI).

On September 10, 2014, the parties filed their Motions for Summary

Judgment, Doc. Nos. 118, 121, 125, with the State joining the NFL's Motion for

Summary Judgment.  Doc. No. 127.  The NFL filed its Opposition to Plaintiff's

Motion on September 29, 2014, Doc. No. 141, and Plaintiff filed her Oppositions

on October 3, 2014.  Doc. Nos. 151, 158.  Replies were filed on October 10, 2014.

Doc. Nos. 194-196 (Plaintiff did not file a Reply). A hearing was held on October 27, 2014.

At the October 27, 2014 hearing, the parties reached an agreement in principle that the NFL will not have any authority over seating decisions at the 2016 Pro Bowl, and that such authority will reside with the Stadium Authority. The parties memorialized this agreement in a November 7, 2014 Stipulation, and Plaintiff subsequently conceded that her ADA claims against the NFL are now moot. *See* Doc. No. 214.

### III. <u>STANDARDS OF REVIEW</u>

**A. Rule 12(b)(1)**

"Because standing and mootness both pertain to a federal court's subject-matter jurisdiction under Article III, they are properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a factual attack, such as the case here, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* (citation omitted). "The court need not presume the truthfulness of

the plaintiff's allegations." *Id.* "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.*

"With one caveat, if the existence of jurisdiction turns on disputed factual issues, the district court may resolve those factual disputes itself." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014) (citations omitted). "The caveat is that a court must leave the resolution of material factual disputes to the trier of fact when the issue of subject-matter jurisdiction is intertwined with an element of the merits of the plaintiff's claim." *Id.* at 1122 n.3 (citing *Safe Air for Everyone*, 373 F.3d at 1039-40). In this case, the jurisdictional issues and the merits of the case are intertwined, and as a result, the moving party "should prevail [on a motion to dismiss] only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Casumpang v. Int'l Longshoremen's & Warehousemen's Union Local 142*, 269 F.3d 1042, 1060 (9th Cir. 2001) (citation and quotation signals omitted).

///

///

**B.     Summary Judgment**

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere

allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on

which a reasonable fact finder could find for the nonmoving party, and a dispute is

'material' only if it could affect the outcome of the suit under the governing law."

*In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at

248).  When considering the evidence on a motion for summary judgment, the

court must draw all reasonable inferences on behalf of the nonmoving party.

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille*

*Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence

of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn

in his favor" (citations omitted)).

## IV.  ANALYSIS

### A.  The NFL's Motion to Dismiss or in the Alternative Motion for Summary Judgment

The NFL argues that Plaintiff lacks standing on her disability

discrimination claims and that in any event, summary judgment should be granted

on each of Plaintiff's claims asserted against the NFL.  In light of the parties'

recent stipulation that the NFL will not have any authority over seating decisions

at the 2016 Pro Bowl, *see* Doc. No. 214, and Plaintiff's concession that her ADA claims against the NFL are now moot, *see* Doc. No. 214, the court GRANTS the NFL's Motion as to Plaintiff's ADA claims against the NFL. Indeed, the only relief Plaintiff could have obtained on her ADA claims against the NFL was injunctive relief, *see* Doc. No. 151, Pl.'s Opp'n at unnumbered pg. 6; *see also Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir. 2002), and the parties' Stipulation moots such claim for relief. *See Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1179 (9th Cir. 2010) (explaining that a claim becomes moot if "'events have completely and irrevocably eradicated the effects of the alleged violation,'" and there is "'no reasonable . . . expectation that the alleged violation will recur'" (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979))).

The court further GRANTS the NFL's Motion as to Plaintiff's disability discrimination claims based on state law, to the extent Plaintiff sought injunctive relief against the NFL. Just as with the ADA claims against the NFL, there is no reasonable expectation that the NFL will violate state disability laws in the future as to seating decisions at Aloha Stadium in light of the parties' Stipulation. Unlike Plaintiff's ADA claims, however, Plaintiff may seek damages on her state law disability discrimination claims, *see* HRS § 489-7.5, and the parties' Stipulation does not affect the viability of these claims. The court

therefore proceeds to address the NFL's arguments as to Plaintiff's remaining state law claims.

### 1.   *Standing*

To have standing for her claims against the NFL, Plaintiff must demonstrate at each stage of the litigation that she has suffered an injury-in-fact, that the injury is traceable to the NFL's actions, and that the injury can be redressed by a decision in her favor. *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (en banc); *see also Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 907 (9th Cir. 2011) ("The irreducible constitutional minimum of standing includes three elements: (1) injury in fact; (2) causation; and (3) redressability.") (internal quotation marks and citation omitted).  Relevant to Plaintiff's remaining claims,[7] the NFL argues that Plaintiff has failed to establish that any injury is traceable to the NFL.  The court rejects this argument.

In particular, the NFL argues that Plaintiff cannot establish that her injury is traceable to the NFL's actions because the NFL had no control over seating decisions at the Pro Bowl.  Doc. No. 125-1, NFL Mot. at 14-16.  In making

---

[7] In its Motion, the NFL additionally argued that Plaintiff failed to establish a real and immediate threat of repeated injury, which is a requirement for injunctive relief, and that Plaintiff's claims cannot be redressed by the injunctive relief she requests.  *See* Doc. No. 125-1, NFL Mot. at 11-17.  In light of the parties' Stipulation, the NFL filed a statement acknowledging that these arguments are now moot.  *See* Doc. No. 210.

24

this argument, the NFL relies on the Declarations of NFL employees and Stadium Authority officials asserting that all decisions related to Plaintiff's access to her front-row seat were the responsibility of the Stadium Authority and its staff, and that the NFL was not involved in any of the actions taken on game day regarding Plaintiff's access to her seat. Doc. No. 126-11, Bandy Decl. ¶ 7; Doc. No. 126-1, Lee Decl. ¶ 5. The NFL also relies on the License Agreement between the NFL and the Stadium Authority, as well as HRS § 109-2, to argue that the Stadium Authority controlled seating.

As an initial matter, neither HRS § 109-2 nor the License Agreement establishes that seating decisions are solely the responsibility of the Stadium Authority. Although HRS § 109-2 generally grants the Stadium Authority power to maintain, operate, and manage Aloha Stadium, it says nothing about whether the Stadium Authority may delegate this power to a third party (such as the NFL). Nor does the License Agreement provide any clear guidance regarding responsibility of seating decisions. Rather, the License Agreement provides that the Stadium Authority's exercise of control and management of Aloha Stadium "shall be consistent with the other provisions of this Agreement," and that the "NFL shall have the right to make all decisions relating to the operation of Aloha Stadium on the Pro Bowl Game," including security. *See* Doc. No. 120-1, Pl.'s

Ex. 1 ¶ 2(b).  Given that security officials were involved in requiring Plaintiff to sit in accessible seating at the 2013 Pro Bowl, neither HRS § 109-2 nor the License Agreement answers whether the Stadium Authority, the NFL, or both, are responsible for Plaintiff's seating at the 2013 Pro Bowl.

Further, the facts of the 2013 Pro Bowl, viewed in a light most favorable to Plaintiff, suggest that the NFL was involved in determining that Plaintiff would not be permitted to sit in her front-row seat.  In particular, the Stadium Authority's Chang testified that the NFL was consulted regarding Plaintiff's request for field access.  *See* Doc. No. 120-2, Pl.'s Ex. 7, Chang Dep. at 6-7.  Indeed, the NFL's Bandy offered the accessible seating tickets to Plaintiff and was involved in the email correspondence determining how to handle Plaintiff's request for field access and assertion that she would go down the stairs on her rear end.  *See* Doc. No. 134, Pl.'s Ex. 4 at NFL000290-92; Doc. No. 134, Pl.'s Ex. 3 at NFL000547-48.  And according to Plaintiff, at the 2013 Pro Bowl, Bandy told her that he was responsible for the decision denying her access to her seat.  Doc. No. 157, Pl.'s Decl. ¶ 23.  Although the NFL disputes Plaintiff's version of events, such factual disputes cannot be resolved on this Motion.  The court therefore DENIES the NFL's Motion to the extent it argues that Plaintiff lacks standing.

## 2. *Summary Judgment -- State Law Disability claims (Counts I and II) and False Imprisonment (Count III)*

The NFL argues that Plaintiff's state law discrimination claims against the NFL fail because she "has not presented any evidence that the NFL or its agents were engaged in any of the acts that she claims were discriminatory," Doc. No. 125-1, NFL Mot. at 28,[8] and that her false imprisonment claim fails because the NFL was not involved in any of the events comprising this claim. *Id.* at 28-29. As explained above, the evidence, viewed in a light most favorable to Plaintiff, suggests that the NFL was in fact involved in determining that Plaintiff would not be permitted to sit in her front-row seat. The court therefore DENIES the NFL's Motion for Summary Judgment on Plaintiff's state law claims.

## B. The State's Joinder in the NFL's Motion

The State filed a Substantive Joinder to the NFL's Motion, asserting that "the arguments raised by the NFL apply equally to the State of Hawaii." Doc.

---

[8]  The NFL also argues, in a single conclusory sentence, that Plaintiff's "state law discrimination claims against the NFL fail as a matter of law for the same reasons that her ADA claims fail." Doc. No. 125-1, NFL Mot. at 28. The court does not construe this single sentence as an attempt to incorporate by reference all of the NFL's summary judgment arguments regarding the ADA claims as to the state law disability claims. Rather, the focus of the NFL's argument on the state law disability claims is directed to arguing that the NFL was not involved in the seating decision.

And in any event, to the extent the NFL did in fact intend to incorporate all of its ADA arguments as to the state law claims, the NFL provided no explanation as to why caselaw on the ADA would apply to Hawaii state disability discrimination claims and/or whether Plaintiff's state law claims are coextensive with the ADA claims. The court will not perform such analysis based on the scant argument provided by the parties.

No. 127.  This Joinder is largely misdirected -- the NFL made several arguments

applicable only to the NFL (*e.g.*, whether the NFL was involved in the seating

decision), and Plaintiff asserts different ADA claims against the State (*e.g.*,

violations of Title II of the ADA against the State as opposed to violations of Title

III of the ADA against the NFL) without the State ever explaining how the NFL's

arguments would apply to the ADA claims against the State.  By failing to address

these differences, the State has failed to carry its burden of establishing that the

NFL's arguments would apply to the State.[9]

Thus, the State (by substantively joining the NFL's Motion), has

failed to carry its summary judgment burden on any of Plaintiff's ADA claims.

Further, because the court denied the NFL's Motion as to Plaintiff's state-law

claims, these claims stand against the State as well.  The court therefore DENIES

the State's Joinder in the NFL's Motion.

## C.    The State's Motion for Partial Summary Judgment

The State argues that summary judgment should be granted on

Plaintiff's Rehabilitation Act claim because it does not apply to Aloha Stadium

---

[9]   The only ADA provision Plaintiff asserts against both the NFL and the State are her
claims under 42 U.S.C. § 12203.  The NFL presented a summary judgment argument as to
§ 12203(a) -- but Plaintiff asserts a violation of § 12203(b), not § 12203(a).  And because the
NFL made no argument as to § 12203(b), the State has failed to carry its burden on this ADA
claim.

where Aloha Stadium receives no federal funds. *See* Doc. No. 121, State Mot. In opposition, Plaintiff argues that for the Rehabilitation Act to apply, she need only establish that the State received federal funds, not that Aloha Stadium or the Stadium Authority received federal funds. Doc. No. 158, Pl.'s Opp'n. Based upon the following, the court finds that neither party has outlined the proper analytical framework for determining whether the Rehabilitation Act applies in this case.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Section 794, as amended in 1988,[10] defines "program or activity" broadly as including, among other things,

all of the operations of --

---

[10] In 1984, the Supreme Court narrowly interpreted the Rehabilitation Act to be program specific -- that is, it applied only to the specific programs that receive federal funds, but not to programs that received no federal funds even if that program was affiliated with an entity that received federal funds. *See Grove City Coll. v. Bell*, 465 U.S. 555 (1984); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624 (1984). In 1988, Congress amended and broadened the Rehabilitation Act to "overturn" this caselaw, and make clear that all of the operations of an entity liable under the Rehabilitation Act constitute a "program or activity" under the Act. *See Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991); S. Rep. No. 64, 100th Cong., 2d Sess. 1, reprinted in 1988 U.S.Code Cong. & Admin. News 3-4.

> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government[.]

29 U.S.C. § 794(b)(1).

Courts interpreting § 794(b)(1) have explained that its reach "does not encompass all the activities of the State." *See Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002). *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 171 (3d Cir. 2002), explains:

> Under the statutory definitions in the Rehabilitation Act, the state, as a whole, cannot be a "program or activity." As other courts have noted, if the entire state government were subject to § 504 whenever one of its components received federal funds, subsection (b)(1)(B) would be redundant. *See Jim C.* [*v. United States*, 235 F.3d 1079, 1081 n.3 (8th Cir. 2000)] (noting that under the flawed interpretation, "both the distributing and receiving state entities would already be covered under (b)(1)(A) whenever either receives federal funds"); *Lightbourn v. County of El Paso*, 118 F.3d 421, 427 (5th Cir. 1997); *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991).

*Id.* at 171.

The Rehabilitation Act's reach is nonetheless expansive -- the term "program or activity" "covers all the activities of the department or the agency receiving federal funds." *Lovell*, 303 F.3d at 1051. Thus, "if a state accepts federal funds for a specific department or agency, it voluntarily waives sovereign immunity for Rehabilitation Act claims against the department or agency -- but only against that department or agency." *Koslow*, 302 F.3d at 171 (citations and quotations omitted). This waiver applies to the entire department -- even where a particular division of a department does not receive federal funds, if another division receives federal funds, then the entire department is subject to the Rehabilitation Act. *See, e.g.*, *Thomlison v. City of Omaha*, 63 F.3d 786, 789 (8th Cir. 1995) (determining that Fire Division was subject to the Rehabilitation Act because even though it received no federal assistance, it was part of the Public Safety Department, which did receive federal funds); *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991) ("If federal health assistance is extended to a part of a state health department, the entire health department would be covered in all of its operations." (quoting S. Rep. No. 64, 100th Cong., 2d Sess. 16 (1988)); *Huber v. Howard Cnty., Md.*, 849 F. Supp. 407, 415 (D. Md. 1994) ("[I]f one part of a department receives federal financial assistance, the whole department is considered to receive federal assistance so as to be subject to

§ 504.")

Neither party addressed this framework -- the analysis is neither whether the State receives federal funds (as argued by Plaintiff), nor whether Aloha Stadium receives federal funds (as argued by the State). Rather, to determine whether the Rehabilitation Act applies to Plaintiff's claims, the court must determine whether Aloha Stadium's "department" receives federal funds. And from the court's own analysis, whether the Rehabilitation Act applies to Aloha Stadium is not a simple question. Aloha Stadium is operated by the Stadium Authority, which, pursuant to HRS § 109-1, is "within the department of accounting and general services [(the "DAGS")] for administrative purposes only." The DAGS is apparently not involved with the day-to-day operations of the Stadium Authority and/or Aloha Stadium -- Aloha Stadium is operated and managed by the Stadium Authority, *see* HRS § 109-2; and operational expenses for Aloha Stadium are paid out of a special fund comprising the rents, ticket sales, parking, and advertising revenues collected for events at Aloha Stadium. *See* HRS § 109-3 (creating the Stadium special fund); Doc. No. 122-3, Russell Uchida Decl. ¶¶ 6-9. DAGS has, however, transferred to the Stadium's special fund cash from Capital Improvement Projects, Doc. No. 122-4, State Ex. B, and it appears that the Stadium Authority's finances are part of the DAGS' budget. *See* HRS § 26-35.

The parties have not addressed whether the Stadium Authority's inclusion within DAGS for "administrative purposes only" requires the court to determine whether DAGS receives federal funds for the Rehabilitation Act analysis. Nor have the parties addressed whether the court should follow *Starr v. Hawaii*, 2007 WL 3254831 (D. Haw. Nov. 2, 2007), which held that the Rehabilitation Act applies to the DAGS where divisions administratively attached to it, the Office of Elections and State Foundation on the Culture and the Arts, receive federal funds. *Id.* at *5. *Starr* explained that "although DAGS does not exercise control or supervision over the day to day operations of those agencies and each agency has its own board and commission and separate budget, those agencies are attached to DAGS because their funding and budget are required to be included in DAGS' consolidated budget pursuant to Hawaii Revised Statutes." *Id.*

Without the parties addressing the effect of the Stadium Authority's inclusion within DAGS for administrative purposes and/or whether the court should follow *Starr*, the parties have failed to convince the court one way or another whether the Rehabilitation Act applies to Aloha Stadium. Because the State has not carried its burden, the court DENIES the State's Motion for Partial Summary Judgment on Plaintiff's Rehabilitation Act claim.

**D.     Plaintiff's Motion for Partial Summary Judgment**

As explained above, there is conflicting evidence as to whether Stadium Authority or NFL officials made the determination that Plaintiff must sit in an accessible seat at the 2013 Pro Bowl. Plaintiff's Motion for Partial Summary Judgment seeks a determination that regardless of who made the actual decision regarding Plaintiff's seating, the NFL was responsible for it. In particular, Plaintiff seeks a determination "that the NFL had the right to make all decisions relating to the operation of Aloha Stadium on the 2013 Pro Bowl Game Day," and that "the NFL created an agency relationship with other entities, namely the Aloha Stadium Authority, [G4S,] and the [HPD], by conferring on them actual authority to make certain decisions for game day operations which were the NFL's sole right to make." Doc. No. 118, Pl.'s Mot. at unmarked p. 3. Plaintiff bases her argument on the language of the License Agreement, as well as an agency theory of law. Based on the following, the court DENIES Plaintiff's Motion.

### 1.     Whether the NFL Had the Right to Make All Decisions Regarding the Operation of Aloha Stadium at the 2013 Pro Bowl

Plaintiff argues that the License Agreement between the NFL and the Stadium Authority establishes that the NFL had the right to make all decisions regarding the operation of Aloha Stadium at the 2013 Pro Bowl. Contrary to

Plaintiff's argument, the License Agreement does not establish such unilateral

control by the NFL.

Rather, the License Agreement establishes that the Stadium Authority

(not the NFL) controls and manages Aloha Stadium, while the NFL has the right

to make certain decisions and is financially responsible for operations for the Pro

Bowl. For example, a section entitled "Description of the Licensed Premises,"

provides, in relevant part:

> The Stadium Authority retains the right to control and
> manage Aloha Stadium at times when the NFL is using
> Aloha Stadium pursuant to this Agreement, but any
> exercise of such control by Stadium Authority shall be
> consistent with the other provisions of this Agreement.
> Notwithstanding the foregoing, the NFL shall have the
> right to make all decisions relating to the operation of
> Aloha Stadium on the Pro Bowl Game Day (as defined
> below), including, but not limited to, the assignment of
> meeting rooms, available storage space, tent space,
> security, in-house labor, contracted labor, and vendor
> personnel. The rights of the Stadium Authority under
> this paragraph shall be exercised in cooperation with the
> NFL and HTA to allow the 2013 Pro Bowl Game and
> related events to be presented in a safe, cost-effective,
> and successful manner.

*See* Doc. No. 120-1, Pl.'s Ex. 1 ¶ 2(b).

Thus, the plain language of the License Agreement provides that the

NFL has the right to make decisions regarding security; it does not *obligate* the

NFL to make such decisions or otherwise cede to the NFL all operations of Aloha Stadium. Rather, the Stadium Authority "retains the right to control and manage Aloha Stadium," meaning that the Stadium Authority controls all aspects of Aloha Stadium, including those areas over which the NFL does not exercise its rights.

Further, other parts of the License Agreement establish that the NFL's right to make decisions regarding security is not absolute, much less well-defined as to the particular issues of this case regarding seating decisions. Specifically, other provisions of the License Agreement provide that the Stadium Authority has a multi-year contract with G4S, the Stadium Authority will provide a draft security plan to the NFL, and the NFL is responsible for all costs for G4S at the Pro Bowl.[11] *Id.* ¶ 5(c)(4). Bandy also testified that the NFL's contract with G4S was to provide on-field security and gate security, and that the NFL was not managing G4S in the stands. Doc. No. 142-2, NFL Ex. A at 41-42. The agreement between G4S and the NFL does not suggest otherwise. *See* Doc. No. 150, Pl.'s Ex. 2 at NFL000776-795. Thus, the NFL's right to make decisions regarding security appears sharply limited in context of the License Agreement as a whole.

---

[11] Neither party submitted any security plan provided by the Stadium Authority to the NFL.

Moreover, the License Agreement is silent regarding the NFL's authority over other staff for the Pro Bowl. The License Agreement provides only that the Stadium Authority shall submit a staffing plan to the NFL for approval, and the NFL may increase staffing at its expense. *See* Doc. No. 120-1, Pl.'s Ex. 1, ¶ 5(c)(3). It appears that this staffing reports to the Stadium Authority, not the NFL -- the License Agreement incorporates the Rules of the Stadium Authority, *id.* ¶ 24, which provides that the manager of the Stadium Authority shall determine and furnish the staff necessary to operate the facility for an event, and which may include, for example, box office personnel, ushers, gate personnel, and security personnel, all at the licensee's expense. *See* HAR § 3-70-10.

Thus, although the License Agreement provides that the NFL may make decisions regarding "security" and must pay for staffing at the Pro Bowl, it does not establish that the NFL was obligated to make *all* decisions regarding the operation of Aloha Stadium at the 2013 Pro Bowl. And in any event, the only decisions at issue in this action are regarding how Plaintiff was treated at the 2013 Pro Bowl. Stadium Authority ushers, G4S security guards, and HPD officers (as well as other Stadium Authority employees via walkie-talkie) were all present when the decision was made that Plaintiff must sit in accessible seating, and the

License Agreement simply does not establish that the NFL controlled all of these individuals and/or controlled seating decisions.

In opposition (and beyond reading out of context the contract language discussed above that the NFL has the right to make decisions regarding security), Plaintiff argues that the NFL had ultimate control over the Pro Bowl in light of an indemnification provision providing that the NFL shall indemnify the Stadium Authority, the HTA, the State, and all of their employees for any losses sustained "by reason of the use or occupation of the Aloha Stadium premises by the NFL." Doc. No. 120-1, Pl.'s Ex. 1, ¶ 15(b). Plaintiff ignores, however, that the License Agreement includes another indemnity provision providing that the Stadium Authority and HTA shall be liable for all claims "caused by the negligent or wrongful act or omission of any officer or employee of the Stadium Authority and/or the HTA while acting within the scope of such employment." *Id.* ¶ 15(c). Thus, contrary to Plaintiff's argument, these indemnification provisions actually suggest that the Pro Bowl includes Stadium Authority and HTA employees that do not report to the NFL and for which the NFL is not responsible. The court therefore rejects that the License Agreement establishes as a matter of law that the NFL is responsible for all actions taken at the 2013 Pro Bowl.

## 2.    Whether the NFL Created an Agency Relationship With Others

Plaintiff argues that all decisions regarding operations at Aloha Stadium for the 2013 Pro Bowl were "either made by the NFL or by its agents under express or implied actual authority conferred by the NFL absent indication a decision was unauthorized."  Doc. No. 118, Pl.'s Mot. at unmarked p. 6.  In other words, Plaintiff argues that the Stadium Authority, HPD, and G4S were the agents of the NFL.

Under Hawaii law, "[a]n agency relationship may be created through actual or apparent authority."  *See Hawaii v. Hoshijo ex rel. White*, 102 Haw. 307, 318, 76 P.3d 550, 561 (2003) (quoting *Cho Mark Oriental Food, Ltd. v. K & K Int'l*, 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992)).  To establish actual authority, there must be "a manifestation by the principal to the agent that the agent may act . . . , and may be created by express agreement or implied from the conduct of the parties or surrounding circumstances.'"  *Id*. (quoting *State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc*., 90 Haw. 315, 325, 978 P.2d 753, 763 (1999)).  In comparison, "[a]pparent authority arises when 'the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he was purported to have.'"  *Cho Mark*

*Oriental Food, Ltd.*, 73 Haw. at 515, 836 P.2d at 1061 (quoting *Hawaiian*

*Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969)).

As to the Aloha Stadium employees, Plaintiff argues that they were

acting under implied actual authority given that the NFL was in charge of

operations, and therefore delegated responsibility to these employees. *Id.* at

unmarked p. 7.  As explained above, however, the License Agreement does not

establish that the NFL had total control of the Pro Bowl.  Thus, to the extent

evidence suggests that Stadium Authority employees made the seating decision for

Plaintiff (as explained above, there is conflicting evidence on this issue that cannot

be resolved on summary judgment), Plaintiff has failed to establish that these

employees were acting on behalf of the NFL and not the Stadium Authority.

As to G4S and HPD employees, although Plaintiff has presented

evidence that they were paid by the NFL, the License Agreement establishes that

*all* staff was paid by the NFL, and that the NFL was required to use G4S.  As a

result, that the NFL paid for their services does not establish an agency

relationship.  Further, determining whether HPD officers and/or G4S employees

were the agents of the NFL would be premature at this time where Plaintiff has not

established that they made the decision that Plaintiff must sit in the accessible

seating. The court therefore DENIES Plaintiff's Motion for Partial Summary Judgment.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the court (1) GRANTS in part and DENIES in part the NFL's Motion to Dismiss or in the Alternative Motion for Summary Judgment, Doc. No. 125; (2) DENIES the State's Joinder in the NFL's Motion, Doc. No. 127; (3) DENIES the State's Motion for Partial Summary Judgment, Doc. No. 121; and (4) DENIES Plaintiff's Motion for Partial Summary Judgment, Doc. No. 118.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 8, 2014.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Ritchie v. Nat'l Football League et al.*, Civ. No. 13-00525 JMS-BMK, Order (1) Granting in Part and Denying in Part Defendant National Football League's Motion to Dismiss or in the Alternative Motion for Summary Judgment, Doc. No. 125; (2) Denying Defendant State of Hawaii Joinder in the National Football League's Motion, Doc. No. 127; (3) Denying the State's Motion for Partial Summary Judgment, Doc. No. 121; and (4) Denying Plaintiff's Motion for Partial Summary Judgment, Doc. No. 118